# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 27, 2007        Decided June 19, 2007

No. 05-3132

UNITED STATES OF AMERICA,
APPELLEE

v.

DOUGLAS MYRON PROCTOR,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 04cr00427-01)

*Neil H. Jaffee*, Assistant Federal Public Defender, argued the cause for the appellant. *A. J. Kramer*, Federal Public Defender, was on brief.

*Ryan W. Scott*, Attorney, United States Department of Justice, argued the cause for the appellee. *Jeffrey A. Taylor*, United States Attorney, and *Roy W. McLeese III*, Assistant United States Attorney, were on brief.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: A jury found appellant Douglas Myron Proctor guilty of unlawful possession

of a firearm and ammunition by a felon in violation of 18 U.S.C. § 922(g)(1). He was sentenced to 120 months' imprisonment and five years' supervised release. Proctor now appeals the district court's denial of his motion to suppress evidence obtained during an inventory search of his vehicle following his arrest for moving violations on the ground that the arresting officers failed to follow standard police procedures when they impounded his car and subsequently retrieved a weapon from a trash bag found in the trunk. For the reasons set forth below, we conclude that the district court erred in denying the motion to suppress and reverse the district court's judgment.

**I.**

At approximately 1:35 a.m. on September 8, 2004, Metropolitan Police Department (MPD) Officer Jody Shegan, and his partner, Officer Martin Nassar, while parked near Spingarn High School at the corner of 26th Street and Benning Road, Northeast, in Washington, D.C., received a radio call informing them that a maroon 1989 Mercury Grand Marquis traveling westbound on Benning Road had failed to stop at a red light. After the vehicle turned onto 26th Street and passed by Officers Shegan and Nassar, they followed it for a short distance before noticing that it had tinted windows. The officers initiated a traffic stop "[a]lmost immediately." Tr. 11/23/04 at 7-8.

Proctor, the driver and sole occupant, produced his license and registration to Officer Nassar. At that time, Nassar noticed the odor of alcohol on Proctor's breath. As he returned to the squad car to check the license and registration information, Nassar signaled to Shegan that Proctor had been drinking. Shegan then approached Proctor and initiated a conversation with him, during which Shegan too smelled alcohol and noticed that Proctor's speech was slurred. When Shegan directed Proctor to step out of the vehicle, Proctor "swayed back and forth and used his vehicle as a leaning post so . . . he wouldn't fall down." *Id.* at 9. Because Proctor exhibited signs of

intoxication, Shegan placed him under arrest for operating a vehicle while intoxicated (OWI) and driving under the influence (DUI).[1]

After Proctor's arrest and while he remained at the scene, the officers conducted an inventory search of the vehicle. In the trunk, the officers recovered a .380 semi-automatic pistol from a "white trash bag," Tr. 4/18/05 at 56, that also contained clothes and Proctor's cell phone bill. From the front passenger seat, the officers recovered another plastic bag containing personal documents with Proctor's name. After waiving his *Miranda* rights, Proctor informed the police that the bag belonged to him but the gun did not. In an indictment filed September 23, 2004, Proctor was charged with unlawful possession of a firearm and ammunition by a felon. On October 20, 2004, he filed a motion to suppress, challenging, *inter alia*, the physical evidence recovered during the inventory search.

At the November 23, 2004 suppression hearing, Officer Shegan, the hearing's only witness, testified that the MPD standard procedure required the officers to impound Proctor's vehicle after his arrest. Shegan, who had been a police officer for twenty years and a member of the MPD for three years, declared that he did not "believe [he] had a choice" in impounding the vehicle, Tr. 11/23/04 at 38, because Proctor was not the owner and no one else was present to take custody of it, *id.* at 38, 24. Shegan further explained that the officers did not attempt to contact the owner to retrieve the vehicle because they "weren't going to wait that long" and that they did not consider parking the car nearby because the police were "still responsible for the vehicle if it [was] parked." *Id.* at 38. Pursuant to the MPD's "new procedure" (Shegan's term) for any vehicle not

---

[1]Proctor ultimately received traffic citations for running a red light and having tinted windows in addition to the OWI and DUI charges. Tr. 11/23/04 at 27.

held as evidence or for civil forfeiture, *id.* at 25, Shegan testified that he requested the dispatch of a "ROC crane"—a crane operated by a private towing company which, by contract with the MPD, conducts towing operations for each Regional Operations Command—to remove the vehicle to a private impoundment lot instead of to the regional MPD station or the MPD impoundment lot, *id.* at 24-25.[2]

Shegan also testified that the MPD procedure required the officers to search "[t]he entire vehicle," *id.* at 26, before removal "[t]o reduce liability on the police department and to preserve any property that the owner of the vehicle or the occupants of the vehicle may have," *id.* at 25. He explained that

> [t]he old policy was if a vehicle is taken to Metropolitan Police Department under the[] same circumstances [as here], the passenger compartment of the vehicle would be inventoried on the scene; and then within a certain amount of time after that, 24, 48 hours after that, then the entire vehicle, if the owner didn't come and pick it up, the entire vehicle would be inventoried. . . . That policy is no longer in existence.

*Id.* at 26-27. According to Shegan, the current search policy went into effect when "Metropolitan Police Department didn't have the room to store these vehicles." *Id.* at 27.

In response to Shegan's testimony, Proctor introduced into evidence a copy of MPD General Order 602.1 which sets forth MPD impoundment and inventory search procedure. General Order 602.1, Automobile Searches and Inventories (May 26, 1972) (GO 602.1), *reprinted in* Appendix for Appellant (AA) at 32. Part I.B.3, entitled "Prisoner's Property," provides, "When a person is arrested in an automobile which he owns or has been

---

[2]Shegan testified that the "new procedure" was developed in response to the lack of MPD impoundment space. Tr. 11/23/04 at 25.

authorized to use and the vehicle cannot be classified [as evidence or for civil forfeiture], that vehicle shall be classified as prisoner's property." *Id.* at 42. Subpart (a) of Part I.B.3 provides that a vehicle "classified as prisoner's property shall be disposed of in any lawful manner in which the person arrested directs. In any case where a prisoner requests that his vehicle be lawfully parked on a public street, he shall be required to indicate his request in writing." *Id.* Subpart (b) provides:

> *If a vehicle classified as prisoner's property* is disposed of so that it *is not taken to a police facility, it shall not be inventoried in any way.* If it is necessary to take such a vehicle into police custody, the vehicle shall be taken to a police facility or to a location in front of or near a police facility. Immediately upon arrival at the police facility the arresting officer shall remove from the passenger compartment of the vehicle any personal property which can easily be seen from outside the vehicle and which reasonably has a value in excess of $25. . . . No other inventory or search of the vehicle shall be made at this time.

*Id.* at 43 (emphases added). And subpart (c) states:

> If a person authorized by the prisoner or the prisoner himself, upon his release, does not claim the vehicle within 24 hours of the time that the prisoner was arrested, a complete inventory of the contents of the automobile shall be made by the arresting officer or an officer designated by an official.

*Id.* Finally, Part I.B.6, entitled "Scope of Inventory," provides:

> Whenever an officer has a right to inventory a vehicle pursuant to this order, the officer shall examine the passenger compartment, the glove compartment, whether or not locked, and the trunk, whether or not

locked. . . . Any container such as boxes or suitcases found within the vehicle shall be opened . . . .

*Id.* at 46-47.

While noting "a conflict or something of a disparity" between Shegan's testimony and GO 602.1 regarding the MPD's impoundment and inventory search procedure, Tr. 11/23/04 at 62, the district court denied Proctor's suppression motion. The court explained that "it is clear . . . through the testimony of [Officer Shegan] that th[e written] procedures have been changed and perhaps because of financial realities or whatever it appears that the city in the last several years has adopted different procedures." *Id.* at 63. The court found the "new procedure"—that is, an inventory search of a vehicle classified as "prisoner's property" whether or not the vehicle is removed to a police facility—"reasonable" and concluded,

I have listened to the testimony of the particular officer and decided, based on the way he has testified and to the content, he seems to be knowledgeable and he strikes me as being an honest police officer with no agenda with respect to this particular vehicle during the time span of the events, that I find nothing that would even remotely suggest a pretextual search in this case as a way of getting inside the trunk of that car.

*Id.* at 64.

A three-day jury trial was held in April 2005. On April 20, 2005, the jury found Proctor guilty and he was sentenced on August 8, 2005 to 120 months' imprisonment and five years' supervised release. This appeal followed.

## II.

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

seizures." U.S. Const. amend. IV. "The touchstone of the Amendment is reasonableness." *United States v. Askew*, 482 F.3d 532, 538 (D.C. Cir. 2007); *see also Cady v. Dombrowski*, 413 U.S. 433, 439 (1973). "'[W]hether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case . . . .'" *South Dakota v. Opperman*, 428 U.S. 364, 375 (1976) (quoting *Cooper v. California*, 386 U.S. 58, 59 (1967)) (alterations in original). Automobiles "are 'effects' and thus within the reach of the Fourth Amendment." *Opperman*, 428 U.S. at 367. "Both the decision to take [a] car into custody and [a] concomitant inventory search must meet the [Amendment's] strictures." *United States v. Duguay*, 93 F.3d 346, 351 (7th Cir. 1996); *see also Colorado v. Bertine*, 479 U.S. 367, 374-76 (1987); *Opperman*, 428 U.S. at 368-70. Thus, "the decision to impound (the 'seizure') is properly analyzed as distinct from the decision to inventory (the 'search')." *Duguay*, 93 F.3d at 351.

Proctor argues that both the impoundment and subsequent search of his vehicle violated the Fourth Amendment because the officers failed to follow the MPD's standard impoundment and inventory search procedure detailed in GO 602.1. Although he does not dispute that adherence to *unwritten* standard police procedure can satisfy the Fourth Amendment, he contends that Shegan's testimony failed to establish that the "new"—and unwritten—MPD procedure had in fact modified GO 602.1. In analyzing Proctor's Fourth Amendment challenge, we review the district court's factual findings for clear error, giving "'due weight to inferences drawn from those facts,'" *United States v. Goree*, 365 F.3d 1086, 1090 (D.C. Cir. 2004) (quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996)), and we review de novo whether the officers' actions were reasonable, *cf. United States v. Brown*, 334 F.3d 1161, 1164 (D.C. Cir. 2003) ("We decide de novo whether the police had reasonable suspicion, reasonable fear, and probable cause.").

A seizure—including by impoundment—conducted without a search warrant is "*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993). One exception is the "community caretaking" exception. *See United States v. Coccia*, 446 F.3d 233, 238 (1st Cir. 2006); *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005). As the Supreme Court observed in *Opperman*, "In the interests of public safety and as part of what the Court has called 'community caretaking functions,' automobiles are frequently taken into police custody." 428 U.S. at 368 (citing *Cady*, 413 U.S. at 441). Indeed, "[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Id.* at 369. The Supreme Court has suggested that a reasonable, standard police procedure must govern the decision to impound. *Bertine*, 479 U.S. at 375-76. In *Bertine*, the defendant challenged the inventory search of his vehicle because the police officers had discretion to choose between impounding the vehicle or parking it in a public place. The Court declared, "Nothing in *Opperman* or [*Illinois v. Lafayette*, 462 U.S. 640 (1983)] prohibits the exercise of police discretion so long as that discretion is exercised *according to standard criteria* and on the basis of something other than suspicion of evidence of criminal activity." *Id.* at 375 (emphasis added).

At least two of our sister circuits have held that the decision to impound must be made pursuant to a standard procedure. *See United States v. Petty*, 367 F.3d 1009, 1012 (8th Cir. 2004) ("Some degree of 'standardized criteria' or 'established routine' must regulate [impoundments]" but "an impoundment policy may allow some 'latitude' and 'exercise of judgment' by a police officer when those decisions are based on concerns related to the purposes of an impoundment."); *Duguay*, 93 F.3d at 351 ("'[S]tandardized criteria or established routine must regulate' inventory searches. Among those criteria which must

be standardized are the circumstances in which a car may be impounded." (internal citation omitted) (alteration in original)). On the other hand, the First Circuit has concluded that the Supreme Court's *Bertine* holding does not require that an impoundment be governed by standard police procedure. *See, e.g.*, *Coccia*, 446 F.3d at 238 ("[W]e do not understand *Bertine* to mean that an impoundment decision made without the existence of standard procedures is per se unconstitutional. Rather, we read *Bertine* to indicate that an impoundment decision made pursuant to standardized procedures will most likely, although not necessarily always, satisfy the Fourth Amendment."). The *Coccia* court explained:

> "Virtually by definition, the need for police to function as community caretakers arises fortuitously, when unexpected circumstances present some transient hazard which must be dealt with on the spot. The police cannot sensibly be expected to have developed, in advance, standard protocols running the entire gamut of possible eventualities. Rather, they must be free to follow 'sound police procedure,' that is to choose freely among the available options, so long as the option chosen is within the universe of reasonable choices."

*Coccia*, 446 F.3d at 239 (quoting *United States v. Rodriguez-Morales*, 929 F.2d 780, 787 (1st Cir. 1991)). The Government invites us to adopt the First Circuit's conclusion that an impoundment is reasonable so long as it "serves the

government's 'community caretaking' interests.'"[3]  Appellee's Br. at 48.  We decline the invitation.

We believe that if a standard impoundment procedure exists, a police officer's failure to adhere thereto is unreasonable and violates the Fourth Amendment. *Cf. United States v. Maple*, 348 F.3d 260, 263-64 (D.C. Cir. 2003) (search of vehicle relocated by police after traffic arrest unreasonable because contrary to GO 602.1).  GO 602.1 provides that a vehicle "classified as prisoner's property shall be disposed of in any lawful manner *in which the person arrested directs*."  GO 602.1, AA at 42 (emphasis added).[4]  Thus, before impounding the vehicle, an

_____

[3]In *United States v. Reese*, 561 F.2d 894 (D.C. Cir. 1977), we suggested—prior to *Bertine*—that the decision to impound be reasonable.  *Id.* at 903 n.17 ("The officers acted in a completely reasonable manner in moving the car to the police station, impounding it and conducting an inventory search.").  It appears that we have not addressed the issue again until now.

[4]Because Proctor was charged with OWI and DUI, we believe the officers were also required to follow the impoundment procedures set forth in the Comprehensive Anti-Drunk Driving Amendments Act of 1991, D.C. Code § 50-2201.05(c-1) (Anti-Drunk Driving Act or Act).  Indeed, both parties agreed that the Act rendered GO 602.1's impoundment procedures obsolete as applied to DUI and OWI arrests.  *See* Appellee's Br. at 39 ("The Act rendered Part I.B.3(a) of General Order 602.1 obsolete as applied to DUI and OWI arrests."); Reply Br. at 9 ("To the extent the Act is more restrictive than the General Order in limiting the options to impoundment of vehicles relating to DUI or OWI arrests, the statute trumps the General Order.").  The Act requires that, before impounding the vehicle, the officer allow the OWI or DUI arrestee to authorize the officer to release the vehicle to a licensed—and capable—driver who can take possession of it within a reasonable amount of time.  *See* D.C. Code § 50-2201.05(c-1)(2)(C) ("The officer shall not cause the vehicle to be impounded if . . . (C) [t]he arrested person *authorizes the officer to release the vehicle*" to

officer should provide the arrestee with the opportunity to arrange for its removal. *See Hill v. United States*, 512 A.2d 269, 274 n.10 (D.C. 1986) ("As 'prisoner's property' [under GO 602.1] . . . a vehicle cannot be impounded without first giving the prisoner an opportunity to make other lawful arrangements for its disposition."); *Arrington v. United States*, 382 A.2d 14, 18 (D.C. 1978) ("[P]olice are authorized to impound a motor vehicle as prisoner property [under GO 602.1] only where the prisoner consents thereto or is incapable of making other arrangements for its disposition."). Proctor, however, was afforded no such opportunity. On the contrary, Shegan testified that the officers were required to impound Proctor's vehicle because no one was present to remove it, *see* Tr. 11/23/04 at 24, Proctor was not the owner and they "weren't going to wait" for the owner to remove it, *id.* at 38; *see also id.* ("I don't believe I had a choice."). Accordingly, the officers' impoundment (seizure) decision violated GO 602.1.

The officers' impoundment decision led to an inventory search that also violated GO 602.1. As noted earlier, Shegan testified that due to a lack of impoundment space at MPD facilities, MPD's "new procedure" necessitated that a ROC crane tow Proctor's vehicle to a private impoundment lot rather

---

a licensed individual not at the scene of the arrest who is physically capable of removing the vehicle in "a reasonable period of time.") (emphasis added). At oral argument, the Government maintained that the burden is on the arrestee in the first instance to request that the vehicle be released to another. But to require an allegedly intoxicated driver to understand that he can avoid impoundment by authorizing the officer to allow another driver to remove the vehicle—without being so advised by the officer—is unrealistic if not unreasonable. If no licensed—and capable—driver can take possession of the vehicle within a reasonable amount of time, or if the arrestee is incapable of making the request, the Anti-Drunk Driving Act requires the officer to impound the vehicle. *Id.*

than to an MPD facility. *Id.* at 24-25, 52-53. According to Shegan, the officers were thus required to search "[t]he entire vehicle" *before* it was towed, *id.* at 26, "[t]o reduce liability on the police department and to preserve any property that the owner of the vehicle or the occupants of the vehicle may have," *id.* at 25. GO 602.1, however, expressly prohibits an inventory search of a vehicle not taken to an MPD impoundment lot. GO 602.1, AA at 43 ("If a vehicle classified as prisoner's property is disposed of so that it is not taken to a police facility, it shall not be inventoried in any way.").[5]

The Fourth Amendment requires, again, that an inventory search be reasonable and, if a standard procedure for conducting an inventory search is in effect, it must be followed. *See Maple*, 348 F.3d at 264-65 ("[T]he reasonableness of the officer's conduct is to be determined by reference to whether he followed the MPD's procedures."); *see also Bertine*, 479 U.S. at 374 n.6 ("Our decisions have always adhered to the requirement that inventories be conducted according to standardized criteria."). Adherence to a standard procedure ensures that an inventory search is "not . . . a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990). The district court concluded, erroneously, that the inventory search of Proctor's vehicle satisfied the Fourth Amendment based on Shegan's testimony that necessity had

---

[5]Had the vehicle been towed to an MPD facility, the arresting officer would have been required "[i]mmediately upon arrival" to remove from the passenger compartment of the vehicle any personal property "easily . . . seen from outside the vehicle" and "reasonably ha[ving] a value in excess of $25." GO 602.1, AA at 43. No further search of the vehicle is permitted unless "a person authorized by the prisoner or the prisoner himself . . . [fails to] claim the vehicle within 24 hours of the time that the prisoner was arrested." *Id.* In that case, an officer is required to make "a complete inventory of the contents of the automobile." *Id.*

forced an unwritten MPD modification to GO 602.1 to allow an inventory search before a vehicle is towed to a private impoundment lot. Tr. 11/23/04 at 63-64. There is plainly insufficient support on this record, however, to conclude that the MPD is no longer bound by GO 602.1.[6] More than a single officer's *ad hoc* description of a new practice is required to decide that a thirty-year-old inventory search procedure—in writing—has been altered by "necessity."

Because the officers failed to follow the MPD standard procedure, the impoundment of Proctor's vehicle was unreasonable and thus violated the Fourth Amendment. Likewise, "if the seizure of the car was unconstitutional, the materials later recovered during the inventory search [are] excluded." *Coccia*, 446 F.3d at 237 n.5 (citing *Duguay*, 93 F.3d at 351). Accordingly, Proctor's motion to suppress should have been granted.

For the foregoing reasons, the judgment of the district court is reversed.

*So ordered.*

---

[6]In fact, MPD Special Order (SO) 03-14, entitled "Implementation of Centralized Towing Program," a copy of which Proctor submitted pursuant to Federal Rule of Appellate Procedure 28(j), indicates that GO 602.1 remains in effect. SO 03-14 provides, "Except as may be modified by the provisions of this Special Order, the applicable provisions of the following directives shall continue to be followed: . . . 4. General Order SPT—602.1 (Automobile Searches and Inventories)." SO 03-14, Implementation of Centralized Towing Program, at 4 (June 15, 2003). SO 03-14 did not modify GO 602.1.