**UNITED STATES**

**v.**

**Ruben SANCHEZ, Defendant.**

**Criminal Docket No. 06CR10334–NG.**

United States District Court,
D. Massachusetts.

Feb. 26, 2008.

Timothy Q. Feeley, United States Attorney's Office, Boston, MA, for United States.

William W. Fick, Federal Defender's Office, Boston, MA, for Ruben Sanchez.

### MEMORANDUM AND ORDER RE: MOTION TO SUPPRESS

GERTNER, District Judge:

Defendant Ruben Sanchez ("Sanchez") has moved to suppress both physical evidence and statements he made shortly following his arrest. Mot. to Suppress (document # 23); Mem. Supp. Mot. to Suppress ("Def. Mem.") (document # 25). The United States has opposed. Gov. Opp. to

Mot. to Suppress ("Gov. Mem.") (document # 26). The Court held a two-day evidentiary hearing on the Motion. Afterward, the government and defendant submitted supplemental memoranda in support of their respective positions. Gov. Suppl. Mem. Opp. ("Gov. Second Suppl. Mem.") (document # 39); Def. Post–Hr'g Br. Supp. Mot. Suppress ("Def. Suppl. Mem.") (document # 42).

As stated in open court on January 29, 2008, the Motion to Suppress is **DENIED** (document # 23) in its entirety.

Because the defendant's Motion to Suppress has two unrelated halves, the Court will address each separately.

### I. MOTION TO SUPPRESS THE PHYSICAL EVIDENCE RECOVERED FROM SANCHEZ'S MOTORCYCLE

Sanchez first argues that the firearm constituting the basis for this prosecution was illegally taken from his motorcycle after he was arrested. He claims that due to the officer's failure to lawfully impound the vehicle, that the subsequent inventory search was nullified.

#### A. Facts Leading to Impoundment

These facts are largely, though not entirely, undisputed.

On September 21, 2006, the Melrose Police Department obtained a warrant for Sanchez's arrest based on threats he allegedly made to his girlfriend, Kathleen Pazyra ("Pazyra"). Transcript of Evidentiary Hearing (July 31–Aug. 1, 2007) ("Tr.") at 8–9, 59; Ex. 1. The next day, detective David Roy ("Roy") was having supper at the Liberty Bell Restaurant in Melrose. He was on duty at the time, and was aware of the active warrant for Sanchez's arrest. Tr. at 8–10. As he was sitting at the counter, he saw a woman—whom he later identified as Pazyra—enter the res-

taurant and sit by herself at a booth. He did not recognize her at that time. Tr. at 15–16.

By coincidence, Officer John Slaney ("Slaney") of the Melrose Police also went to the Liberty Bell that evening. Slaney ordered food to go and chatted with Roy. Tr. at 14–15, 16.

While Roy and Slaney were talking, a motorcycle approached the Liberty Bell and parked. Its driver entered the restaurant, then approached Pazyra and had a conversation with her. Roy identified the motorcycle's driver as Sanchez, based on a photograph he had seen and printed out earlier in the day. Tr. at 18. Slaney exited the restaurant, and was followed a short time later by Roy. Tr. at 19–20.

When Roy rejoined Slaney outside the restaurant, Slaney told him that he had checked the registration plate on Sanchez's motorcycle. Slaney's search revealed that the license plate was issued for a 1976 Honda, rather than the Harley–Davidson Sanchez was driving. Tr. at 20. Furthermore, the license plate had been revoked for lack of insurance, and was registered to one Robert Barrett. Tr. at 24. Slaney and Roy planned to arrest Sanchez on the outstanding warrant when he exited the restaurant. *See* Tr. at 20–21.

Sanchez and Pazyra exited the restaurant and continued talking while standing near the motorcycle. Roy watched them talk for a time, then approached them, saying "Kathleen," and hoping to elicit a response from Pazyra; she did respond. Tr. at 28. He also asked Sanchez, "Are you Ruben Sanchez?" After Sanchez replied in the affirmative, Roy arrested him. Tr. at 29–30.

Roy next called the officer in charge of the shift to request permission to tow Sanchez's motorcycle, which he believed was required by Melrose Police policy. Tr. at 29, 32–33; Ex. 4. He did so "[b]ecause the wrong plate was on it, it was attaching

plates that didn't belong on it." Tr. at 32. Roy accordingly cited Sanchez for violating Massachusetts General Laws ch. 90, § 23. Tr. at 36–37. He also thought that Sanchez would not "be out of the station in a short period of time." Tr. at 33. The officer in charge issued permission to tow the motorcycle. At no time did Roy ask Sanchez whether he had an alternative means for moving the motorcycle or ask the owner or manager of the Liberty Bell, in whose parking lot it was located, whether the motorcycle should be removed. Nor was there a posted rule against overnight parking. Tr. at 86, 94, 114.

Roy then began to perform an inventory search of the motorcycle. He opened the unlocked saddlebags near the rear wheel and found a firearm. Tr. at 39–40. That firearm forms the basis for Sanchez's federal charge.

**B.** *Legal Standards Governing the Impoundment Decision*

█ A seizure—including by impoundment—conducted without a search warrant is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (internal quotations omitted). One such exception involves what the Court has called the "community caretaking function," based on public safety interests. *South Dakota v. Opperman*, 428 U.S. 364, 368, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (citing *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)).

█ The Supreme Court has held that to be constitutional a reasonable, standard police procedure must govern the decision to impound. *Colorado v. Bertine*, 479 U.S. 367, 375–76, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). In *Bertine,* the defendant chal-

lenged the inventory search of his vehicle because the police officers had discretion to choose between impounding the vehicle or parking it in a public place. The Court held that police officers may be invested with discretion as to whether to impound a vehicle as long as some "standard criteria" exist to channel the police's discretion, and the impoundment decision is made "on the basis of something other than a suspicion of evidence of criminal activity." *Id.* at 375, 107 S.Ct. 738.

■ The reason for these requirements and their careful enforcement are clear. Vehicle impoundments, and searches coincident with them, would vitiate the Fourth Amendment's warrant requirement if used as a ruse for a criminal investigative search. *See also Florida v. Wells*, 495 U.S. 1, 4–5, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990) (analyzing policy with respect to inventory search following impoundment, and stating that where the police "had no policy whatever [concerning how to treat closed containers] . . . the instant search was not sufficiently regulated to satisfy the Fourth Amendment. . . .").[1]

---

1. The First Circuit diluted *Bertine* by holding that in evaluating each of the criteria, as well as the more general Fourth Amendment inquiry, the court should examine the totality of the circumstances. *See United States v. Coccia*, 446 F.3d 233, 238 (1st Cir.2006). Moreover, the Court even suggested that the absence of standardized criteria would not necessarily invalidate a search, if it were otherwise "reasonable." *Id.* at 238–39.

Significantly, this holding stands in stark contrast to the rule in three circuits, which have held that the decision to impound must be made pursuant to a standard procedure, which by definition needs to be promulgated in advance. *See United States v. Proctor*, 489 F.3d 1348, 1353 (D.C.Cir.2007) (explicitly declining to adopt the First Circuit's position on inventory searches, and holding that "if a standard impoundment procedure exists, a police officer's failure to adhere thereto is

## C. *Application to This Case*

### 1. *Whether Standard Criteria Existed To Channel Police Discretion*

■ Sanchez argues that the Melrose Police's impoundment policy was facially deficient because it deals only with standards for when a vehicle may not be impounded, and therefore permits unchecked discretion as to when a vehicle *should* be impounded. Def. Suppl. Mem. at 7 (document # 42). His contention is not persuasive.

True, the Melrose Police policy, as written, pertains mainly to "Vehicle Inventory," not to impoundment per se. General Order GO3–02000, Ex. 4 at 1. Moreover, to the extent it addresses impoundment, it dictates the circumstances in which a vehicle should not be impounded. Tr. at 44. The policy states "[a] vehicle *shall not be inventoried* if the vehicle is: [1] Legally parked and locked[;] [2] Removed by a third party[;] [3] Towed at the owner/operator's request (disabled vehicle)[; or] [4] If owner request [sic] a reasonable and lawful alternative for removal." *Id.* (emphasis added).

---

unreasonable and violates the Fourth Amendment"); *United States v. Petty*, 367 F.3d 1009, 1012 (8th Cir.2004) ("Some degree of 'standardized criteria' or 'established routine' must regulate [impoundments]" but "an impoundment policy may allow some 'latitude' and 'exercise of judgment' by a police officer when those decisions are based on concerns related to the purposes of an impoundment."); *United States v. Duguay*, 93 F.3d 346, 351 (7th Cir.1996) (" '[S]tandardized criteria or established routine must regulate' inventory searches. Among those criteria which must be standardized are the circumstances in which a car may be impounded." (internal citation omitted) (alteration in original)).

This Court need not address the implications of *Coccia*. I find that standardized criteria did exist in this case.

But an impoundment policy does not have to look like the tax code to be sufficient under *Bertine*. The Supreme Court has emphasized the importance of "standardized criteria or established routine," *Wells*, 495 U.S. at 4, 110 S.Ct. 1632 (citing *Illinois v. Lafayette*, 462 U.S. 640, 648, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983)) (emphasis added), the latter clause suggesting that the policy need not be in writing. *See United States v. Hawkins*, 279 F.3d 83, 85–86 (1st Cir.2002) (considering unwritten aspects of inventory search policy); *cf. Coccia*, 446 F.3d at 238–39.

Here, the fair inference of the words "legally parked and locked," together with established Melrose practice and the approval process, adequately structure police discretion to meet the standards of *Bertine*. Detective Roy interprets—not unfairly—"legally parked and locked" not to include vehicles that are violating Massachusetts automobile law, including laws with respect to licensing. Such a vehicle could not be legally driven from the scene by anyone, including the arrested Sanchez, who was not the license holder.

In addition to the policy language, established Melrose routine suggested the vehicle had to be towed. Roy testified that, "based on [his] experience," Tr. at 94, the Melrose Police will tow a vehicle if it is violating a law, if it is damaged to the point of immobility, or if the vehicle is unlawfully parked and the owner or operator is arrested. *See* Tr. at 40, 92, 93–94. In fact, Roy suggested that in those situations, the decision to request impoundment of the vehicle was not discretionary. *See* Tr. at 40 ("You'd have to tow [the vehicle].")), 94 ("[I]f the vehicle is illegal, dam-

aged or there's an arrest, ... they'll tow the vehicle."), 92 (similar testimony); *cf.* Tr. at 93 (suggesting uncertainly that there may be discretion to tow where the operator is arrested and the vehicle is lawfully parked).

Finally, that policy indicated that the officer at the scene did not have sole discretion as to whether a vehicle should be impounded. He or she must radio the officer in charge of the shift and request permission, as Roy did here. *See* Tr. at 32–33, 92–93.

■ While this Court is always concerned when exceptions to the Fourth Amendment are permitted to spread to situations far beyond their original rationale, that is not the case here. The routine Roy described, with the exceptions enumerated in the written policy, provides the police with objective criteria in advance regulating when a vehicle should be towed. *Cf. United States v. Donnelly*, 885 F.Supp. 300, 306–07 (D.Mass.1995) (holding an impoundment unconstitutional where no meaningful criteria existed as to what situations should result in a vehicle being towed).[2]

### 2. Whether the Impoundment Complied with the Melrose Police Policy

Where standard criteria exist but are not followed, the circumstances may often suggest that the search is unreasonable for Fourth Amendment purposes. *See Coccia*, 446 F.3d at 239. Sanchez suggests three reasons why the impoundment of his motorcycle failed to comply with the Melrose Police policy and established routine, and

**2.** Indeed, the facts of this case—with a clear statutory violation implicating the lawfulness of driving the motorcycle—makes impoundment even more reasonable than in the usual cases in which it has been justified. The "community caretaking function" allows the police to impound a car as long as there is a "basis for believing that the safety of an individual or the public is jeopardized" and that basis is objectively reasonable. *See, e.g., Commonwealth v. Brinson*, 440 Mass. 609, 614–15, 800 N.E.2d 1032 (2003).

is therefore unreasonable. First, he contends that his motorcycle was within the scope of exceptions to the policy preventing impoundment. Whether or not it was improperly licensed, he contends, was irrelevant, because the motorcycle was "legally parked and locked." Second, he argues that he is not in violation of any statute at the time of the impoundment, because the Massachusetts motor vehicle laws only pertain to public ways, and the motorcycle was in a private parking lot. Finally, Sanchez interprets a separate Massachusetts statute as barring the removal of his vehicle under these circumstances. None of these arguments is persuasive.[3]

### a. *Whether Sanchez's Motorcycle Fit Within the Exceptions to the Impoundment Policy*

■ Sanchez construes the phrase "legally parked" as pertaining solely to *parking*. Since there is no dispute that the motorcycle was in compliance with specific parking ordinances and markings, impoundment was improper. Def. Suppl. Mem. at 14 (document # 42). The government, on the other hand, argues that "legally parked" should be construed so as to encompass violations like an illegal license plate. Gov. Second Suppl. Mem. at 5 (document # 39).

Sanchez's argument proves too much to be persuasive. If accepted, it would prevent the police from towing a car that violates a state statute and cannot legally be driven in its current form, merely because it happened to comply with parking regulations. The motorcycle here could not have been ridden by anyone unless it was re-registered and the offending plates

removed. Towing was the only alternative. The officer had no obligation to wait for Sanchez to make his own arrangements.

The other three exceptions in the impoundment policy relate to whether Sanchez could have sought to have another person remove the motorcycle. None apply here. No other person could have operated the motorcycle with the offending plates. *See* Mass. Gen. Laws ch. 90, §§ 9, 34J. Sanchez did not request any other form of removal, and the police were not obliged to seek any. *See Vega–Encarnacion v. Babilonia,* 344 F.3d 37, 41 (1st Cir.2003); *cf. Commonwealth v. Caceres,* 413 Mass. 749, 751 n. 2, 604 N.E.2d 677 (1992) (noting that if a legal, reasonable, alternative to police impoundment is requested, the police should honor that request). Nor were they obliged to leave an inoperable vehicle that violated a statute in the parking lot indefinitely. *See also Commonwealth v. Ellerbe,* 430 Mass. 769, pp. 775–76, 723 N.E.2d 977 (Mass.2000).

### b. *Whether Sanchez Was in Violation of Mass. Gen. Laws ch. 90, § 23*

■ Sanchez next contends that he was not, in fact, violating the law at the moment of his arrest. He does not dispute that false license plates were attached to his vehicle. Rather, he argues that the false plates were legally insufficient to justify impounding his motorcycle because that statute cannot be violated while a vehicle is on private property.

According to Sanchez, the Commonwealth's motor vehicle laws are only enforceable when a vehicle is on a public way. Def. Suppl. Mem. at 14–20 (docu-

---

**3.** The United States argues that state law is inapplicable to this prosecution. Gov. Suppl. Opp. at 4–5 (document # 32). But these questions of Massachusetts law help determine the scope of the Melrose Police's inventory policy and whether the decision to impound Sanchez's motorcycle was "reasonable" within the meaning of the Fourth Amendment. *See, e.g., United States v. Goodrich,* 183 F.Supp.2d 135, 143 n. 11 (D.Mass. 2001).

ment # 42). While that is generally correct, one exception involves the statute for which he was cited. Chapter 90, § 23 does not contain an element requiring that the violation occur on a public way, unlike many other motor vehicle statutes. *Compare* Mass. Gen. Laws ch. 90, § 23, with, *e.g.*, *id.* § 34J (requiring drivers to maintain insurance and containing a public way provision). Indeed, the Supreme Judicial Court has considered ch. 90, § 23, and squarely held that it does *not* require that a violation happen on a public way. *Commonwealth v. Murphy*, 409 Mass. 665, 667–68, 568 N.E.2d 1143 (1991). While that case concerned a different portion of § 23, its reasoning, relying on the absence of the "public way" term from the statute, applies as well to the portion of the statute addressing false license plates. *See id.* at 667, 568 N.E.2d 1143 ("The Legislature chose not to limit the application of the statute to public ways."). The police were correct that Sanchez was in continuing violation of § 23, regardless of the location of the motorcycle.

**c. Whether the Police Were Barred from Impounding the Motorcycle Under Mass. Gen. Laws ch. 266, § 120D**

▆ Finally, Sanchez argues that the police were barred from impounding the motorcycle by operation of a separate statute. Def. Suppl. Mem. at 11–12, 20–22 (document # 42). That law provides that "no person" shall remove a vehicle from private property unless with the consent of the owner of the vehicle or at the request of the property owner. Mass. Gen. Laws ch. 266, § 120D. The Massachusetts Supreme Judicial Court has applied the law to find that the police improperly impounded a vehicle after arresting the driver. *Commonwealth v. Brinson*, 440 Mass. 609, 614–15, 800 N.E.2d 1032 (2003). But *Brinson* is not applicable.

In *Brinson*, the question was whether the police could impound a car, otherwise lawfully parked in a private lot, simply because they had arrested the defendant. *See id.* at 612–13, 800 N.E.2d 1032. No other statutory violations were considered. The community caretaking function was held not to apply.[4] *Id.* at 615–16, 800 N.E.2d 1032. In construing § 120D, the Supreme Judicial Court noted, "Cars left unattended on private property are a purely private matter except in circumstances absent here." *Id.* at 617, 800 N.E.2d 1032. Although *Brinson* did not clarify what those circumstances might be, it strongly hinted that a public concern could override the privacy concerns implicit in § 120D. *See id.* at 613–16, 800 N.E.2d 1032 (discussing public safety risk and the threat of theft or vandalism). One such circumstance is the ongoing violation of another statute—here, Sanchez's violation of § 23.

This holding fits closely with the Supreme Judicial Court's examination of the Commonwealth's registration laws in *Murphy*. The *Murphy* Court distinguished between a statute requiring a license to drive on a public way, *see* Mass. Gen. Laws ch. 90, § 10, and another which revoked the right to drive on public or *private* ways along with the revocation of a driver's license, *see id.* § 23. *See Murphy*, 409 Mass. at 668, 568 N.E.2d 1143. Similarly, there is a distinction between a merely unregistered vehicle on private property, *see* Mass. Gen. Laws ch. 90, § 9, and one that has false plates attached with the intent to conceal the identity of the vehicle, *see id.* § 23. The purpose of the statute, to deter those who would falsely identify a vehicle, means that the motorcycle's presence in the parking lot was not a "purely private matter." *Cf. Brinson*, 440 Mass. at 617, 800 N.E.2d 1032. The police could tow the vehicle to ensure that no person

---

4. *See* n. 2, *supra.*

drove it until it had the proper license plates attached.

### 3. Whether the Decision To Impound Was Made on a Proper Basis

██ The second *Bertine* criteria is that the decision to impound be made "on the basis of something other than a suspicion of evidence of criminal activity." 479 U.S. at 375, 107 S.Ct. 738. This requirement is especially critical. The rationale for the impoundment has to be benign and non-investigatory or else the impoundment/inventory exception would fully swallow the warrant requirement. A police officer can always reach into his grab bag of parking rules and regulations as a ruse to get into a car for investigative purposes.[5] The encounter has to be routine, such as to enforce traffic laws that implicate the vehicle's ability to be driven or to deal with a public safety issue.

Slaney checked the registration of the motorcycle after he was told by Roy that there was an arrest warrant for Sanchez. There was no indication that he did so for any investigative purpose. The warrant fully authorized Sanchez's arrest; it derived from threats Sanchez had allegedly made to his girlfriend. No further investigation was called for. Roy decided to impound the motorcycle upon learning of the licensing violation. *See* Tr. at 41–42.[6] The licensing violation was not minor. Sanchez's motorcycle had attached to it license plates belonging to a different vehicle and a different person. The plates had been revoked for failure to maintain insurance. Tr. at 24–25; Ex. 3. While the decision to impound the motorcycle may have been made after the decision to arrest Sanchez, the false plates were an independently reasonable basis to impound the motorcycle. *See* Mass. Gen. Laws ch. 90, § 23.

Under the circumstances, the impoundment of Sanchez's motorcycle was reasonable under the Fourth Amendment.[7]

## II. MOTION TO SUPPRESS SANCHEZ'S STATEMENTS

██ Sanchez also moves to suppress his statements made to Roy and Bureau of Alcohol, Tobacco, and Firearms Agent John Mercer ("Mercer") following his arrest. Sanchez asserts that the interrogation procedure deprived him of his *Miranda* rights.[8]

### A. Facts Concerning Sanchez's Statements

Sanchez was not informed of his rights at the time of his arrest. Tr. at 87. After

---

5. *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) cannot be applied to impoundment decisions without doing violence to this constitutional protection.

6. It is therefore unnecessary to address whether Pazyra told Roy that the firearm was in the motorcycle's saddlebag—the statement took place after Roy's decision to impound the motorcycle and after he began the impound and inventory procedure. *See* Tr. at 41.

7. The Court declines to consider whether probable cause existed to search the motorcycle. It also need not address whether the community caretaking doctrine applies.

8. As a preliminary matter, the Court must also decide whether to grant the government's Motion to Strike Sanchez's affidavit pertaining to his questioning. The United States argues that because Sanchez declined to testify (and be cross-examined), his affidavit should be stricken. *See* Mot. to Strike (document # 40). Whether to strike is within the Court's discretion, *see United States v. Baskin*, 424 F.3d 1, 3 (1st Cir.2005), as it may receive any relevant evidence at a suppression hearing, *United States v. Schaefer*, 87 F.3d 562, 570 (1st Cir.1996). The Court finds that the government's objection goes to the weight to be given to the affidavit. The Motion to Strike is therefore **DENIED.**

the arrest but before Sanchez was questioned, Roy contacted ATF Agent Mercer to inform him of the arrest and the recovery of the firearm, and to see if he would be interested in starting a federal investigation of Sanchez. Tr. at 47–48. Mercer and Roy met at the Melrose Police Department on September 23, the day after Sanchez's arrest. Tr. at 48. Because it was a Saturday, Sanchez was unlikely to be able to speak with a lawyer before the following Monday.

Mercer and Roy reviewed Sanchez's criminal records. According to Roy, Mercer "was kind of surprised that [Sanchez] was out walking around," Tr. at 49; the record reflects at least 16 convictions, a number of which involved violence, *see* Ex. 14. Mercer was interested in finding out where Sanchez had obtained the gun. No efforts were made to tape the interview, which would have assured an accurate assessment of the constitutionality of Sanchez's interrogation. In fact, the officers differ in their accounts as to whether they even discussed taping the interview with Sanchez. Roy said they did discuss it, Tr. at 107–08, but Mercer denied that the conversation took place, and stated that it was his policy not to record interviews, Tr. at 154–56. The differences between the two accounts is troubling, but not dispositive of Roy's credibility. Sadly, there is no federal law comparable to the Massachusetts Supreme Judicial Court's decision in *Commonwealth v. DiGiambattista*, 442 Mass. 423, 813 N.E.2d 516 (2004), that custodial interrogations must be recorded.

Mercer and Roy approached Sanchez in the holding cell, and Roy introduced Mercer as an ATF agent. Roy asked Sanchez if he would like to discuss the gun with the two of them, and Sanchez agreed. Tr. at 48. No warnings had yet been given to signify to him that he had the right not to agree. The three of them left the holding cell and went upstairs to a conference room; Sanchez was handcuffed with his hands in front of him. He declined Mercer's suggestion that he bring along an uneaten sandwich. Tr. at 153–54. On cross-examination and in its papers, the defense has suggested Sanchez had a serious drug problem and was suffering withdrawal at the time of the interview. Tr. at 172; Def. Suppl. Mem. at 28 (document # 42).

When they arrived in the interview room, Sanchez had still not been read his *Miranda* rights. Before doing so, Mercer claims to have made several statements, as follows. He reiterated that he was a federal agent and interested in learning where Sanchez had obtained the gun. Tr. at 129. He told Sanchez that, based on Sanchez's criminal record, he could be facing a mandatory minimum of 15 years in prison. Tr. at 159. Mercer further stated that if Sanchez cooperated, he would put in a good word with whichever authorities, federal or state, prosecuted Sanchez's case. *See* Tr. at 160–61. Sanchez did not respond. Tr. at 160.

Sanchez' version is not dramatically different. He contends that Mercer told him that he "wanted to help me out by keeping my case in state court, rather than federal court where I would face a longer sentence." Aff. of Ruben Sanchez ("Sanchez Aff."), Ex. A to Def. Mem. (document # 25). Mercer denied having told Sanchez that he had any control over which jurisdiction prosecuted the case. Tr. at 161.

At that point, Roy read to Sanchez his *Miranda* rights from the standard Melrose Police Department card. Tr. at 50–51; *see* Ex. 7. After each right, Roy paused and asked Sanchez "Do you understand that?" Each time, Sanchez responded affirmatively. Tr. at 52. And when Roy asked if Sanchez wanted to talk to them, he replied, "Yeah." Tr. at 52. Significantly, Roy, Mercer, and Sanchez all

signed the *Miranda* card, reflecting Sanchez's acknowledgment of his *Miranda* rights.

The subsequent interview lasted approximately 45 minutes or an hour. Tr. at 161. Sanchez told Mercer where he had obtained the gun—from an unidentified white male at a drug house in Lynn. Tr. at 136. He also said that he planned to sell the gun for money to buy more drugs. Tr. at 172. Sanchez declined, however, to cooperate in some respects. *See* Tr. at 162.

### B. Whether Sanchez's Statements Were Knowing and Voluntary

Sanchez claims that, considering the totality of the circumstances, his statements were not knowing and voluntary and thus should be suppressed as infringing upon his Fifth Amendment rights. The Supreme Court has listed a number of factors to be considered in determining whether such a waiver was knowing and voluntary: the "crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health ... [and] the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation." *Withrow v. Williams*, 507 U.S. 680, 693–94, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) (citations omitted).

 The government argues that *Miranda* warnings were appropriately administered here—that Sanchez acknowledged in writing that he had received them, and thereafter voluntarily spoke to the officers. In order for a waiver of the *Miranda* rights to be voluntary, Sanchez must have made his choice freely and deliberately, and must have understood the nature of

the rights being waived. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

Sanchez does not argue that he did not understand the content of the rights as they were read to him; indeed, he acknowledged as much to Roy. *See* Tr. at 52. Sanchez does contest, however, whether his waiver was made freely and deliberately.

Sanchez argues that under the circumstances of his interrogation, including Mercer's comments to him and his condition as a drug addict, the oral *Miranda* warnings—and his oral acknowledgment of them [9]—were insufficient. He does not elaborate, however, what about the oral nature of the warnings made them less substantial than written ones would have been. Instead, he analogizes to two recent District of Massachusetts cases, each of which is distinguishable.

In *United States v. Harty*, 476 F.Supp.2d 17 (D.Mass.2007), the interrogating agent knew that the defendant was "upset" and "hyperventilating" when she was speaking to him, but made no effort to secure a waiver because she did not consider what she was doing "interrogation." *Id.* at 27. Here, the officers testified that Sanchez's affect was "fine," and—as noted above—Sanchez did reply in the affirmative when asked if he wanted to speak to the officers immediately after being read his rights. And in *United States v. Reyes*, 434 F.Supp.2d 58 (D.Mass.2006), the officers merely "advised" the defendant of his *Miranda* rights. *Id.* at 62. They did not seek to ensure that he understood the content of the rights or, apparently, seek confirmation that the defendant wished to speak to them. *See id.* at 66–67. Here, as

---

9. To be sure, Sanchez did sign a form specifically acknowledging that he understood his rights and had them "in mind." Ex. 7. But as he correctly argues, Sanchez never explicitly signed a waiver of his rights; signing the card enumerating the *Miranda* rights was merely an acknowledgment that he had received them. *See id.*

noted above, Roy paused to ascertain Sanchez's understanding after each right.

■] Sanchez also points to Mercer's pre-warning statements, which clearly had something to do with Sanchez's decision to speak with the officers. *See* Sanchez Aff., Ex. A to Def. Mem. (document #25). But Mercer's statements, standing alone, did not prevent Sanchez from freely and deliberately deciding to forgo his rights in order to speak with the officers. As described above, while Mercer's characterization of his statements differs, Tr. at 159–60, the accounts are in fact not far apart. Sanchez claims Mercer told him that he was facing a mandatory minimum 15 years in prison if he was convicted in federal court, that he would receive less time if he was prosecuted in a state court, and that Mercer could ensure that that happened. *See* Sanchez Aff., Ex. A to Def. Mem. (document #25). Mercer's account differs only in degree. He claimed to have told Sanchez that he would "probably [get] the same time" in state proceedings, Tr. at 130, and that he would put in a good word for him if he answered Mercer's questions, Tr. at 131.

Even accepting Sanchez's account, Mercer's actions were not sufficient to trigger a Fifth Amendment violation under current decisional law. Mercer correctly indicated that the 15–year sentence that would follow a federal armed career criminal conviction. He correctly noted that cooperation could help Sanchez avoid that. Whether Mercer's putative help would come through recommending state prosecution or another charging decision is not clear, and not material to the outcome here.[10] Mercer's pressure, while certainly a factor in this Court's consideration of the

totality of the circumstances, is insufficient to vitiate Sanchez's waiver. *See United States v. Gaines,* 295 F.3d 293, 299 (2d Cir.2002); *United States v. Baldacchino,* 762 F.2d 170, 179 (1st Cir.1985).

There is no question that Mercer was doing his best to conform to the letter, but not the spirit, of the law. He piled on the horror stories about what would happen if Sanchez did not cooperate—horror stories which, in fact, were not inaccurate. And he did so while Sanchez was uncounseled: Mercer admitted that he wanted to act quickly to talk to Sanchez before he obtained a lawyer. Tr. at 146. If the interrogation happened a day later, Sanchez would have had counsel.

Nevertheless, shortly after Mercer's statements, Sanchez was informed of his rights to remain silent and to have counsel present, and he signed the acknowledgment form, which weighs in favor of finding a voluntary waiver. So do Sanchez's age and repeated experience with the criminal justice system, *see* Ex. 14. There was no extended questioning before Sanchez made his confession. After the *Miranda* warnings were given, he spoke immediately. Even Sanchez's allegation that "Mercer ... told me that the only way I could help myself was by providing information to him," *id.,* is not enough. Discussing the evidence against a suspect and the reasons he should cooperate is not inherently coercive. *United States v. Tutino,* 883 F.2d 1125, 1138 (2d Cir.1989) (considering discussion following *Miranda* warnings).

■ Nor were these warnings and the waiver vitiated because Sanchez was suffering from narcotics withdrawal, impair-

---

**10.** The Massachusetts Armed Career Criminal Act does require a 15–year mandatory minimum sentence for possession of a firearm if the offender has three prior convictions of violent crimes or serious drug offenses.

Mass. Gen. Laws ch. 269, § 10G(c). But there are lesser included offenses that a prosecutor could elect to charge instead, such as possession of a firearm by a felon. *See, e.g.,* 18 U.S.C. § 922(g).

ing his physical condition and mental health and, as a consequence, his judgment. He notes that he was found with syringes in his possession, admitted having a serious drug problem, and was "tired" when the officers questioned him. Def. Suppl. Mem. at 32 (document # 42). But while interrogating someone in the midst of a drug withdrawal is surely troubling, withdrawal and the extent to which it impairs judgment is a matter of degree. *See, e.g., United States v. Rodriguez–Rodriguez,* 393 F.3d 849, 855 (9th Cir.2005). The defendant has provided some evidence to suggest that he *might* have been suffering through withdrawal at the time of the interrogation, but the Court has no basis for speculating how severe the symptoms were—nothing in his behavior in the diner, nothing in his behavior in the parking lot, nothing in his interactions with the police. As such, there is nothing in the record to contradict Mercer's statement that Sanchez "was alert. His answers to questions were clear." Tr. at 132. Nor was there anything to contradict Roy's testimony that Sanchez seemed "normal," Tr. at 87, and "fine," Tr. at 106. *Cf. United States ex rel. Collins v. Maroney,* 287 F.Supp. 420, 423 (E.D.Pa.1968) (concluding statements were not voluntary based in part on expert testimony that defendants had likely suffered "muscular twitching, pain and loss of appetite ... vomiting, diarrhea and weight loss" throughout the course of the interrogation, and observation of interrogating officer that two defendants requested doctors and " '[a]ll three of them were sick' ").

 Finally, Sanchez argues that the *Miranda* warnings were ineffective because they were given mid-stream—after Mercer started speaking—rather than at the beginning of the interview. Mercer's statements to Sanchez were a prelude to the interrogation, rather than part of the interrogation itself. Interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (footnotes omitted). That is, without a *Miranda* warning, police are not permitted to subject a suspect to questioning "or its functional equivalent." *Id.* at 301, 100 S.Ct. 1682. Mercer's statements were just that—statements. They were not designed, in and of themselves, to elicit a response from Sanchez, and they did not do so.

The situation is not analogous to *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). In *Seibert,* the interrogation was clearly intended to elicit—and did elicit—incriminating responses from the suspect. *See id.* at 604–06, 124 S.Ct. 2601. Both the plurality, *see id.* at 616, 617, 124 S.Ct. 2601, and Justice Kennedy in his concurring opinion, *see id.* at 620, 124 S.Ct. 2601, emphasized the fact that the suspect had actually made statements to the police. With the *Miranda* warnings administered afterward, it would not be clear whether the previous, unwarned statement was admissible. *Id.* at 616, 124 S.Ct. 2601 (plurality opinion). Here, the warnings were administered before Sanchez began to speak. That is sufficient to distinguish *Seibert:* under these circumstances, where the defendant made no pre-warning statements, there is less risk of confusion or coercion.

In the totality of the circumstances, as the law has been interpreted by the First Circuit and the Supreme Court, the Court finds that Sanchez's statement was voluntary and the *Miranda* waiver enforceable.

### III. *CONCLUSION*

For the foregoing reasons, the government's Motion to Strike (document # 40) is **DENIED.** The defendant's Motion to

Suppress (document # 23) is **DENIED.** The case is currently set for a trial date of April 14, 2008, 9:00 a.m., with a pretrial conference on April 2, 2008, at 2:30 p.m., both in Courtroom 2.

**SO ORDERED.**