# United States Court of Appeals

## For the First Circuit

No. 03-1674

UNITED STATES OF AMERICA,

Appellee,

v.

LARRY J. COCCIA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Circuit Judge,

Siler,* Senior circuit Judge,

and Howard, Circuit Judge.

Raymond E. Gillespie on brief for appellant.
S. Waqar Hasib, Special Assistant United States Attorney,
with whom Michael J. Sullivan, United States Attorney, was on
brief, for appellee.

May 5, 2006

*Of the Sixth Circuit, sitting by designation.

**HOWARD**, **Circuit Judge**.  Defendant Larry Coccia appeals, on several grounds, his conviction for possession of a firearm while subject to a domestic restraining order, pursuant to 18 U.S.C. § 922(g)(8).  We affirm.

## I.

We present the facts in the light most favorable to the verdict, see United States v. Boulerice, 325 F.3d 75, 79 (1st Cir. 2003), reserving a discussion of some facts for our analysis.

Coccia, a retired U.S. Air Force officer, was in the midst of a difficult divorce in Pennsylvania in 2001.  A Pennsylvania family court had issued a domestic restraining order against Coccia on April 2, 2001.  The order forbade him from abusing, harassing, or threatening his wife or children, and from "possessing, transferring or acquiring any weapons" for one year from the date of the order.

To increase his chances of securing more favorable visitation rights with his children, Coccia traveled to New England to seek a favorable psychological evaluation from an "Ivy League" doctor.  Ultimately, he secured an appointment with a psychiatrist, Dr. Margaret McGovern, in Wellesley, Massachusetts.  Coccia met with Dr. McGovern on three consecutive days in November 2001.

During the first session, Dr. McGovern became "spooked" by her new patient, who refused to provide any information about where he was staying.  Concerned for her safety, Dr. McGovern

-2-

arranged to have her daughter call during the second session to confirm that she was safe. Matters worsened at the second session. Coccia stated that he might plan a bombing or disperse anthrax; that he was capable of such things based on his military experience; that Dr. McGovern would read about his actions in the papers; that he would go after President Bush; and that he had been previously caught with firearms in his car in Maryland in violation of a judge's order. Dr. McGovern was sufficiently troubled by Coccia's comments that she called the FBI before the third session.[1] Two FBI agents, accompanied by two Wellesley police officers, including Detective Jill McDermott, met with Dr. McGovern shortly before the appointment. Dr. McGovern and the officers agreed that, in light of Coccia's comments, a more extensive in-patient psychiatric evaluation was warranted.

Coccia arrived in a rental car, jam-packed with his personal possessions, and parked in Dr. McGovern's circular driveway directly in front of her front door.[2] Dr. McGovern met with Coccia, informed him that the she had called the FBI, and notified Coccia that FBI agents were waiting for him. Thereafter, while the officers and agents met with Coccia, Dr. McGovern

---

[1] The event triggering the call was the then-unexplained crash of an airliner in New York on morning of November 12, 2001. This crash, and more general concerns about terrorism following the September 11, 2001 attacks, increased Dr. McGovern's fear that Coccia posed a real danger.

[2] Dr. McGovern practiced out of her home.

prepared a "pink paper", i.e., an order from a medical professional providing for the involuntary commitment and psychiatric evaluation of an individual thought to be a danger to himself or others.[3] Coccia was upset and hostile. He discussed his divorce, the custody proceedings, and his intent to relocate to Colorado. But he did not answer the officers' questions about where he was staying in Massachusetts. Upon learning that his car would be towed, Coccia refused to give his car keys to the officers or consent to a search of the vehicle. While awaiting the ambulance, Coccia called his sister in Michigan to tell her what was happening to him.

After Coccia was taken away, Detective McDermott and her partner arranged to tow Coccia's vehicle. A subsequent inventory search at the Wellesley Police Department's impound lot revealed several double-edged knives, a replica pistol, and a rifle case. At this point, Detective McDermott and her partner obtained a search warrant. After obtaining the warrant, the officers opened Coccia's rifle case, which contained an assault rifle and approximately 1300 rounds of ammunition. The officers also found documentation regarding the divorce and child custody actions, a copy of the restraining order, a knapsack containing over $160,000 in cash, and a receipt for a recent purchase of ammunition.

---

[3] See generally McCabe v. Life-Line Ambulance Service, Inc., 77 F.3d 540, 547-49 (1st Cir. 1996).

-4-

Coccia was indicted on one count of violating 18 U.S.C. § 922(g)(8), which outlaws possession of a firearm by anyone subject to a domestic restraining order. He moved to suppress the firearm on the ground that the decision by the Wellesley police officer to impound his vehicle violated his Fourth Amendment rights. He argued that the seizure of his vehicle was unreasonable because he could have made other arrangements to remove it from Dr. McGovern's driveway. At the suppression hearing, Dr. McGovern and McDermott testified for the government. Terri Torres, Coccia's sister, and Tim Aiken, a friend of Coccia's, testified for the defense that other arrangements could have been made for Coccia's vehicle. The district court denied the motion and held that the towing decision was reasonable under the circumstances.

At trial, the government presented the testimony of McDermott and a firearms expert, as well as documentary and physical evidence. Coccia elected to represent himself, with standby counsel assisting him, and took the stand on his own behalf. He testified that he was heartbroken by his family situation and desperately trying to improve it, had not said anything inappropriate to Dr. McGovern, had purchased the gun and ammunition as an investment many years before, had never fired the gun, had never seen the restraining order, and was in the process of moving to Colorado. Coccia's parents and sister testified regarding Coccia's character and family travails.

The jury convicted him, and the district court, departing upward from the applicable guidelines sentencing range based upon Coccia's dangerousness, sentenced him to sixty months' imprisonment. This appeal followed.

**II.**

Coccia raises several challenges to his conviction. First, he argues that the district court erred in denying his motion to suppress. Second, he asserts that the court erred in denying his motion for acquittal on the ground that the Pennsylvania restraining order did not contain the restrictions explicitly required by 18 U.S.C. § 922(g)(8)(C)(ii). Third, he contends that § 922(g)(8) is unconstitutional under the Second Amendment, the Tenth Amendment, the Due Process Clause of the Fifth Amendment, and the Commerce Clause.[4]

A. Motion to Suppress

Coccia contests the towing of his car from Dr. McGovern's property as an unreasonable seizure in violation of the Fourth Amendment.[5] The government responds that the decision by the

_____

[4] The government questions whether Coccia preserved all issues for plenary appellate review but argues Coccia's claims fail on the merits in any event. Except where we note otherwise, we will assume arguendo that Coccia's claims were preserved.

[5] He does not, however, challenge the subsequent inventory search of his car after it was towed. In any event, if the seizure of the car was unconstitutional, the materials later recovered during the inventory search would be excluded. See United States v. Duguay, 93 F.3d 346, 351 (7th Cir. 1996).

-6-

police officers to impound the car was a reasonable exercise of their community caretaking function.

We consider Coccia's claim under a bifurcated standard. See United States v. Kornegay, 410 F.3d 89, 93 (1st Cir. 2005). We review factual findings for clear error and legal conclusion de novo. See United States v. Meada, 408 F.3d 14, 20 (1st Cir. 2005). In so doing, "we will uphold a denial of a motion to suppress if any reasonable view of the evidence supports it." United States v. Garner, 338 F.3d 78, 80 (1st Cir. 2003).

Generally, a law enforcement officer may only seize property pursuant to a warrant based on probable cause describing the place to be searched and the property to be seized. See Horton v. California, 496 U.S. 128, 133 n.4 (1990). There are, however, exceptions to this requirement, including the community caretaking exception.[6] See Cady v. Dombrowski, 413 U.S. 433, 446-447 (1973). The community caretaking exception recognizes that the police perform a multitude of community functions apart from investigating crime. In performing this community caretaking role, police are "expected to aid those in distress, combat actual hazards, prevent

_____

[6]At least one commentator has argued that the community caretaking function should not be considered an exception to the warrant requirement because police officers acting pursuant to community caretaking objectives can seldom meet the requirements necessary to obtain a warrant. Therefore, the Warrant Clause of the Fourth Amendment should be deemed inapplicable to community caretaking searches and seizures. See, e.g., Debra Livingston, Community Caretaking and the Fourth Amendment, 1998 U. Chi. Legal F. 261 (1998).

potential hazards from materializing and provide an infinite variety of services to preserve and protect public safety." United States v. Rodriguez-Morales, 929 F.2d 780, 784-85 (1st Cir. 1991). Relevant here, the community caretaking function encompasses law enforcement's authority to remove vehicles that impede traffic or threaten public safety and convenience. See S. Dakota v. Opperman, 428 U.S. 364, 368-69 (1976).

Coccia acknowledges the community caretaking exception, but, citing Opperman and Colorado v. Bertine, 479 U.S. 367 (1987), he argues that the community caretaking exception does not apply to the impoundment of his car because the government failed to establish that the car was towed from Dr. McGovern's property pursuant to standard operating procedures. We disagree with his contention that the absence of standardized criteria invalidates the impoundment at issue in this case.

Neither Opperman nor Bertine holds that the impoundment of a vehicle conducted in the absence of standardized protocols is a per se violation of the Fourth Amendment. Indeed, Opperman does not even concern impoundments. Its focus is on the need for standards to govern inventory searches conducted after a lawful impoundment. See also Florida v. Wells, 495 U.S. 1, 4 (1990) (stating that criteria or standardized routine must guide an officer's discretion during an inventory search); United States v. Hellman, 556 F.2d 442, 444 (9th Cir. 1977) ("It is the inventorying

practice and not the impounding practice that, if routinely followed . . . could render the inventory search a reasonable search under Opperman.").

Bertine as well was concerned primarily with the constitutionality of an inventory search. It is true that the Court did state that the impoundment of the car in that case was reasonable under the Fourth Amendment because it was conducted pursuant to standard criteria and was based on something other than the suspicion of criminal activity. 479 U.S. at 375. Contrary to Coccia's suggestion, however, we do not understand Bertine to mean that an impoundment decision made without the existence of standard procedures is per se unconstitutional. Rather, we read Bertine to indicate that an impoundment decision made pursuant to standardized procedures will most likely, although not necessarily always, satisfy the Fourth Amendment. See Miranda v. City of Cornelius, 429 F.3d 858, 864 (9th Cir. 2005) ("[T]he decision to impound pursuant to the authority of a city ordinance and a state statute does not, in and of itself, determine the reasonableness of the seizure under the Fourth Amendment."); see also United States v. Goodrich, 183 F. Supp. 2d 135, 140-41 (D. Mass. 2001) (stating that impoundments conducted pursuant to standardized procedures fall within a safe harbor of constitutionality).

Courts, including this one, have frequently held that impoundments of vehicles for community caretaking purposes are

consonant with the Fourth Amendment so long as the impoundment decision was reasonable under the circumstances. See Rodriguez-Morales, 929 F.2d 780, 786 (1st Cir. 1991) (collecting cases). This reasonableness analysis does not hinge solely on any particular factor. See United States v. Miller, 589 F.2d 1117, 1125-26 (1st Cir. 1978) (concluding that the seizure of a boat was constitutional under the community caretaking exception, without regard to the existence of standard procedures, because the officers' conduct in boarding the boat was reasonable under all of the circumstances); Miranda, 429 F.3d at 865 (stating, in an impoundment case, that the question upon review "of a state-approved search (or seizure) is not whether the search or seizure was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment.").

We have explained previously that it is inappropriate for the existence of (and adherence to) standard procedures to be the sine qua non of a reasonable impound decision:

> Virtually by definition, the need for police to function as community caretakers arises fortuitously, when unexpected circumstances present some transient hazard which must be dealt with on the spot. The police cannot sensibly be expected to have developed, in advance, standard protocols running the entire gamut of possible eventualities. Rather, they must be free to follow "sound police procedure," that is to choose freely among the available options, so long as the option chosen is within the universe of reasonable choices. Where . . . the police have solid, non-investigatory reasons for impounding a car, there is no need for them to show that they followed explicit criteria in deciding to impound, as long as the decision was reasonable.

-10-

Rodriguez-Morales, 929 F.2d at 787. We did not decide in Rodriguez-Morales whether standard procedures could be required where, as here, the impoundment was followed by an inventory search, but we do not think a per se rule requiring such standards would be appropriate. 929 F.2d at 787 n.3. As explained in Rodriguez-Morales, standard protocols have limited utility in circumscribing police discretion in the impoundment context because of the numerous and varied circumstances in which impoundment decisions must be made. See id. at 787. Moreover, a police officer's discretion to impound a car is sufficiently cabined by the requirement that the decision to impound be based, at least in part, on a reasonable community caretaking concern and not exclusively on "the suspicion of criminal activity." Bertine, 479 U.S. at 375. Accordingly, the impoundment of Coccia's car did not violate the Fourth Amendment merely because there was no evidence that the impoundment was done pursuant to pre-existing police protocols.

As we held in Rodriguez-Morales, whether a decision to impound is reasonable under the Fourth Amendment is based on all the facts and circumstances of a given case. See id. at 785 (stating that to find whether the impoundment of a car was reasonable a court must "look to all the facts and circumstances of the [present] case in light of the principles set forth in prior decisions"). For several reasons, the decision to tow Coccia's car from Dr. McGovern's property was reasonable.

-11-

First, Coccia was being removed from Dr. McGovern's property in an ambulance for a psychiatric evaluation, and there is no claim that the decision to evaluate Coccia was pretextual. Because Coccia would be indisposed for an indeterminate, and potentially lengthy, period, the officers properly made arrangements for the safekeeping of the vehicle, which was packed with his personal belongings. Because Coccia's car was filled with many of his belongings, it was a possible target for theft or vandalism. See United States v. Ramos-Morales, 981 F.2d 625, 626 (1st Cir. 1992) (Breyer, C.J.) (impounding a vehicle to protect it from theft or vandalism is reasonable under the community caretaking exception).

Second, towing the vehicle reduced the risk of a future confrontation between Coccia and Dr. McGovern. Coccia knew that Dr. McGovern had been involved in the decision to commit him and there was testimony that Coccia was angry about the commitment. Under the circumstances, the officers were reasonable in concluding that removing Coccia's car from Dr. McGovern's property would eliminate the need for Coccia to return to Dr. McGovern's property to collect his car and thereby reduce the possibility of a violent altercation.

Third, Coccia's comments to Dr. McGovern led to a concern that Coccia's car might contain items constituting a threat to public safety, such as explosive material, chemicals or biological agents. Pursuant to the community caretaking function, police may

-12-

conduct warrantless searches and seizures to take possession of dangerous material that is not within anyone's control. See Cady, 413 U.S. at 447-48 (finding warrantless search proper under the community caretaking exception where the officers reasonably believed that a gun was abandoned in the trunk of a car).

Finally, there was no obvious alternative means for removing the car other than impoundment. The only call that Coccia made before going to the hospital was to his sister in Michigan, and he did not inform the officers of another means to remove the car. In these circumstances, the officers were reasonable in concluding that there was no one immediately available to take the car.[7] See United States v. Vega-Encarnacion, 344 F.3d 37, 41 (1st Cir. 2003) ("Caselaw supports the view that where a driver is arrested and there is no one immediately on hand to take possession, the officials have a legitimate non-investigatory reason from impounding the car.")

Despite these facts supporting the reasonableness of the impound decision, Coccia argues that the impoundment was unreasonable because Officer McDermott admitted that she wanted to

---

[7]Coccia contends that the seizure of his car was improper because the officers did not provide him with an opportunity to arrange for someone else to pick-up the car. There is no such requirement. See Vega-Encarnacion, 344 F.3d at 41 ("Law enforcement officials are not required to give arrestees the opportunity to make arrangements for their vehicles when deciding whether impoundment is appropriate").

search the car, and that the impoundment was unlawful under Massachusetts law. Neither contention is persuasive.

That Officer McDermott may have favored impounding the car, in part, because she wished to search its contents is not dispositive. A search or seizure undertaken pursuant to the community caretaking exception is not infirm merely because it may also have been motivated by a desire to investigate crime. "As long as impoundment pursuant to the community caretaking function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure." Rodriguez-Morales, 929 F.2d at 787; see also Bertine, 479 U.S. at 372 (search is valid if it is not for the "sole purpose of investigation"). As discussed above, there were legitimate community caretaking justifications for impounding Coccia's car and there was no evidence that these justifications were merely pretext for an investigatory search.[8]

---

[8]There is precedent for an alternative approach limiting our reasonableness inquiry to the objective facts justifying a seizure for community caretaking purposes and not considering the officer's subjective motivation. Cf. United States v. Beaudoin, 362 F.3d 60, 66 n.1 (1st Cir. 2004) (concluding that officers' subjective intent is irrelevant in determining the constitutionality of a search pursuant to the emergency exception to the warrant requirement). As this issue is not outcome determinative here, we do not reach the question of whether a showing that the officers' subjective motive was entirely investigatory would suffice to invalidate a warrantless seizure defended by the government on community caretaking grounds.

-14-

Finally, assuming that the legality of the impoundment under state law is relevant to the Fourth Amendment inquiry, the impoundment of Coccia's car did not violate Massachusetts law. Under Mass. Gen. L. ch. 266, § 120 D, a car may be only be towed from private property at the request of the car owner or the property owner. See Commonwealth v. Brinson, 800 N.E.2d 1032, 1038 (Mass. 2003). Officer McDermott testified that Dr. McGovern wanted the car removed from her property. This testimony was supported by Dr. McGovern's statements to the officers that she feared Coccia. The officers could have reasonably inferred from Dr. McGovern's statements that she wanted the car towed to avoid any further confrontation with Coccia.[9]

In sum, we conclude that the officers acted reasonably by towing Coccia's car from Dr. McGovern's property. The motion to suppress was therefore properly denied.

B. Motion to Acquit

Coccia argues that the district court erred in denying his motion for acquittal because the Pennsylvania domestic abuse order did not meet the requirements of 18 U.S.C. § 922(g)(8)(C)(ii). Specifically, Coccia maintains that the order is inadequate because

---

[9]In a related vein, Coccia incorrectly contends that an impoundment of a car on private  property is per se unreasonable under the community caretaking exception because the car is not impeding traffic. See 3 W.R. LaFave, Search & Seizure § 7.3 (c) at 521 (3d ed. 1996) (collecting cases where the impoundment of a car on private property was held to comport with the Fourth Amendment).

-15-

it does not use the same verbiage as the statute, which requires that the order "explicitly prohibit[s] the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury . . . ." 18 U.S.C. § 922(g)(8)(C)(ii). Coccia posits that, because the statute requires the order to "explicitly" prohibit "physical force," only those exact words will suffice. Coccia also contends that the district court's use of the broad Pennsylvania statutory definition of "abuse" (which does not match verbatim the wording in § 922(g)(8)(C)(ii)) in the jury instructions did not cure this shortcoming.[10] The government maintains that the order's language meets the statutory requirement. We review a district court's Fed. R. Crim. Pro. 29 determinations de novo. United States v. Pimental, 380 F.3d 575, 583-84 (1st Cir. 2004).

The one circuit that has addressed this issue readily concluded that an order directing the defendant to "refrain from abusing" his wife satisfied the requirements of 18 U.S.C. § 922(g)(8)(C)(ii). See United States v. Bostic, 168 F.3d 718, 722 (4th Cir. 1999). We agree. "In scrutinizing [statutory] language, we presume . . . that Congress knew and adopted the widely accepted legal definitions of meanings associated with the specific words enshrined in the statute." United States v. Nason, 269 F.3d 10, 16 (1st Cir. 2001).

---

[10] Coccia did not object to this jury instruction at trial and does not argue that its use constituted plain error. See generally United States v. Zanghi, 189 F.3d 71, 79 (1st Cir. 1999).

-16-

The definition of "abuse" as a verb includes "[t]o injure (a person) physically or mentally." Black's Law Dict. (8th ed. 2004). "Abuse" as a noun includes "[p]hysical or mental maltreatment, often resulting in mental, emotional, sexual, or physical injury." Id. Thus, the commonly understood definition of "abuse" includes violent acts involving physical force within the definition. This suffices. "[C]ourts are bound to afford statutes a practical, commonsense reading," O'Connell v. Shalala, 79 F.3d 170, 176 (1st Cir. 1996), and Coccia's narrow reading, which would subvert Congress' intentions in passing § 922(g)(8), fails this test.

C. Constitutional Claims

Coccia raises a host of constitutional challenges to 18 U.S.C. § 922(g)(8). First, Coccia asserts that the statute violates individual rights embodied in the Second Amendment because (1) the rights may be lost too readily and (2) restraining order forms that provide clearer notice are available. Second, Coccia claims that § 922(g)(8) is unconstitutional under the Commerce Clause because, in light of the Supreme Court's rulings in United States v. Lopez, 514 U.S. 549 (1995) and United States v. Morrison, 529 U.S. 598 (2000), it seeks to regulate conduct with no real economic impact. Third, Coccia posits that § 922(g)(8) violates the Due Process Clause, as applied, because he did not received fair notice that his conduct was wrongful. See Lambert v. California, 355 U.S. 225 (1957). Finally, Coccia asserts that § 922(g)(8) violates due

-17-

process and the Tenth Amendment because it violates state sovereignty. Specifically, Coccia contends that 18 U.S.C. § 2265 is overly broad and conflicts with Massachusetts' requirement that out-of-state restraining orders be registered, and thereby makes its application to him fundamentally unfair.

We review challenges to the constitutionality of a statute de novo. United States v. Caro-Muniz, 406 F.3d 22, 26 (1st Cir. 2005). We conclude that Coccia is essentially inviting us to overturn established case law with these claims.

As to Coccia's Second Amendment challenge, even the one circuit court to conclude that the rights embodied in the Second Amendment vest in the individual, rather than the State, has concluded that the procedural requirements to be followed before imposing § 922(g)(8)'s restrictions adequately safeguard the right to possess firearms. See United States v. Emerson, 270 F.3d 203, 261-65 (5th Cir. 2001). See also United States v. Price, 328 F.3d 958, 961-62 (7th Cir. 2003)(discussing Emerson). Indeed, "[n]o circuit court which has addressed the question has found 922(g)(8) unconstitutional under the Second Amendment." United States v. Lippman, 369 F.3d 1039, 1044 (8th Cir. 2004)(collecting cases). Given that Coccia has conceded that he had notice of his hearing in family court, attended the hearing, and participated in the hearing, we see no basis for departing from this well-established authority. Moreover, we reject Coccia's contention that the restraining order

-18-

was unclear. Coccia's order specifically provided, in bold-face type, that "Defendant is prohibited from possessing, transferring or acquiring any weapons for the duration of this order." There can be no misunderstanding of such a clear prohibition.

Coccia's Commerce Clause argument is untenable in light of our case law rejecting this very argument. See United States v. Wilkerson, 411 F.3d 1, 9-10 (1st Cir. 2005); see also United States v. Felton, 417 F.3d 97, 103-4 (1st Cir. 2005). Indeed, this court has characterized facial challenges to § 922(g)'s constitutionality under the Commerce Clause as "hopeless." See United States v. Cardoza, 129 F.3d 6, 10-11 (1st Cir. 1997); United States v. Blais, 98 F.3d 647, 649 (1st Cir. 1996).[11]

We have also rejected a Lambert challenge to § 922(g)(8), concluding that it passes constitutional muster regarding notice because both the "proscribed conduct and the affected class of persons are explicitly set forth." United States v. Meade, 175 F.3d 215, 225 (1st Cir. 1999); see also United States v. Denis, 297 F.3d 25, 28-31 (1st Cir. 2002). As noted above, Coccia's restraining order specifically forbade him from possessing firearms.[12] As we

---

[11] There is no dispute that Coccia's weapon traveled in interstate commerce.

[12] Coccia argues that, under 18 Pa. C.S. § 6105, he is not forbidden from having firearms unless the restraining order specifically orders the "confiscation" of his weapons. Coccia did not raise this claim in the district court, and it falls well-short of persuading us that a plain error has occurred. See United States v. Vazquez-Rivera, 407 F.3d 476, 483 (1st Cir. 2005)(arguments not

-19-

said in Meade, given the potential for tragic encounters between domestic abusers and their victims, "a person who is subject to such [a domestic restraining order] would not be sanguine about the legal consequences of possessing a firearm." 175 F.3d at 226.

Coccia's final due process/Tenth Amendment challenge is also unavailing. This court has held that "section 922(g)(8) is totally devoid of Tenth Amendment implications" and does not intrude upon state actors in administering their domestic relations laws. See Meade, 175 F.3d at 225; see also Bostic, 168 F.3d at 723-24. Further, 18 U.S.C. § 2265[13] and the analogous Massachusetts provision are consistent rather conflicting; registration is not a mandatory prerequisite to enforcement of another state's restraining order in Massachusetts. See M.G.L.A. 209A § 5A. Therefore, there is no fundamental unfairness in applying § 922(g)(8) to Coccia.[14]

---

raised before the district court are reviewed for plain error only). Coccia presents no reason why the Pennsylvania statute should apply to his conduct in Massachusetts and, more fundamentally, how the Pennsylvania statute can trump a federal statute addressing the same issue. Further, the restraining order form at issue only included a confiscation provision for weapons that had been used in an act of abuse by the defendant.

[13] This section provides that any protection order issued by a state in compliance with certain procedural standards will be accorded full faith and credit in all other states and that such orders will be enforced by the other states without prior registration. See 18 U.S.C. §2265.

[14]We have also considered the pro se supplemental brief that Coccia submitted after argument. The arguments raised therein are duplicative of those asserted by his counsel or are otherwise unpersuasive.

## III.

For the reasons stated above, Coccia's conviction is **<u>affirmed</u>**.